1
2
3
4
5

**UNITED STATES DISTRICT COURT**

6

**DISTRICT OF NEVADA**

7   LUCY A. STEPHENS,                              )
                                                   )        Case No. 2:13-cv-00096-JCM-PAL
8                            Plaintiff,            )
                                                   )        **REPORT OF FINDINGS AND**
9   vs.                                            )        **RECOMMENDATION**
                                                   )
10  CAROLYN W. COLVIN,[1]                          )        (Mtn to Reverse - Dkt. #11)
                                                   )        (Mtn to Affirm - Dkt. #14)
11                           Defendant.            )
    ───────────────────────────────────────       )
12

13          This case involves judicial review of administrative action by the Commissioner of Social

14  Security denying Plaintiff Lucy A. Stephens' claim for Supplemental Security Income under Title XIV

15  of the Social Security Act (the "Act") and for disability insurance benefits under Title II of the Act.

16                                          **BACKGROUND**

17          On September 4, 2009, Plaintiff filed an application for disability insurance benefits, alleging

18  she became disabled on July 23, 2009.  AR[2] 114-123.  On September 9, 2009, Plaintiff filed an

19  application for Supplemental Security Income, alleging she became disabled on July 23, 2009.  AR

20  124-130.  The Social Security Administration ("SSA") denied Plaintiff's application initially and on

21  reconsideration.  AR 16.  A hearing before an administrative law judge ("ALJ") was held on June 21,

22  2011.  AR 28-51.  In a decision dated June 30, 2011, the ALJ found Plaintiff was not disabled.  AR 16-

23  23.  The ALJ's decision became the Commissioner's final decision when the Appeals Counsel denied

24  review on November 23, 2012.  AR 1-3.

25  ────────────────

26          [1]Carolyn W. Colvin became the Acting Commissioner of the Social Security Administration on
    February 14, 2013.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, she is substituted for
27  Michael J. Astrue as the Defendant in this matter.

28          [2]AR refers to the Administrative Record, which was delivered to the undersigned upon the
    Commissioner's filing of her Answer (Dkt. #8) on April 2, 2013.

On January 22, 2013, Plaintiff filed a Complaint (Dkt. #1) in federal court, seeking judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The Commissioner filed her Answer (Dkt. #8) on April 2, 2013.  Plaintiff filed a Motion for Reversal (Dkt. #11) on May 6, 2013.  The Commissioner filed a Motion to Affirm and Opposition (Dkt. #27) on July 3, 2013.  Plaintiff filed a Reply (Dkt. #15) on July 22, 2013.  The court has considered the Motion to Remand, the Opposition and Cross-Motion, and the Reply.

**DISCUSSION**

**I.    Judicial Review of Disability Determination**

District courts review administrative decisions in social security benefits cases under 42  U.S.C. § 405(g).  *See Akopyan v. Barnhart*, 296 F.3d 852, 854 (9th Cir. 2002).  The statute provides that after the Commissioner of Social Security has held a hearing and rendered a final decision, a disability claimant may seek review of the Commissioner's decision by filing a civil lawsuit in federal district court in the judicial district where the disability claimant lives.  *See* 42 U.S.C. § 405(g).  That statute also provides that the District Court may enter, "upon the pleadings and transcripts of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing."  The Ninth Circuit reviews a decision of a District Court affirming, modifying, or reversing a decision of the Commissioner de novo.  *Batson v. Commissioner*, 359 F.3d 1190, 1193 (9th Cir. 2003).

The Commissioner's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); *see also Ukolov v. Barnhart*, 420 F.3d 1002 (9th Cir. 2005).  However, the Commissioner's findings may be set aside if they are based on legal error or not supported by substantial evidence.  *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1052 (9th Cir. 2006); *see also Thomas v. Barnhart*, 278 F.3d 947, 954 (9th Cir. 2002).  The Ninth Circuit defines substantial evidence as "more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995); *see also Bayliss v. Barnhart*, 427 F.3d 1211, 1214 n. 1 (9th Cir. 2005).  In determining whether the Commissioner's findings are supported by substantial evidence, the court "must review the administrative record as a whole, weighing both the evidence that supports and the evidence that

1  detracts from the Commissioner's conclusion." *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998);

2  *see also Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996).

3      Under the substantial evidence test, the Commissioner's findings must be upheld if supported by

4  inferences reasonably drawn from the record. *Batson,* 359 F.3d at 1193. When the evidence will

5  support more than one rational interpretation, the court must defer to the Commissioner's interpretation.

6  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see also Flaten v. Sec'y of Health and Human*

7  *Serv.,* 44 F.3d 1453, 1457 (9th Cir. 1995). Consequently, the issue before the court is not whether the

8  Commissioner could reasonably have reached a different conclusion, but whether the final decision is

9  supported by substantial evidence.

10      It is incumbent on the ALJ to make specific findings so that the court does not speculate as to

11  the basis of the findings when determining if the Commissioner's decision is supported by substantial

12  evidence. Mere cursory findings of fact without explicit statements as to what portions of the evidence

13  were accepted or rejected are not sufficient. *Lewin v. Schweiker*, 654 F.2d 631, 634 (9th Cir. 1981).

14  The ALJ's findings "should be as comprehensive and analytical as feasible, and where appropriate,

15  should include a statement of subordinate factual foundations on which the ultimate factual conclusions

16  are based." *Id.*

17  **II.    Disability Evaluation Process**

18      The claimant has the initial burden of proving disability. *Roberts v. Shalala*, 66 F.3d 179, 182

19  (9th Cir 1995), *cert. denied*, 517 U.S. 1122 (1996). To meet this burden, a claimant must demonstrate

20  an "inability to engage in any substantial gainful activity by reason of any medically determinable

21  physical or mental impairment which can be expected . . . to last for a continuous period of not less than

22  12 months." 42 U.S.C. § 423(d)(1)(A). The claimant must provide "specific medical evidence" to

23  support his or her claim of disability. If a claimant establishes an inability to perform his or her prior

24  work, the burden shifts to the Commissioner to show that the claimant can perform other substantial

25  gainful work that exists in the national economy. *Batson*, 157 F.3d at 721.

26      The ALJ follows a five-step sequential evaluation process in determining whether an individual

27  is disabled. *See* 20 C.F.R. § 416.920; *see also Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). If at any

28  step, the ALJ makes a finding of disability or non-disability, no further evaluation is required. *See* 20

C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *see also Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). The first step requires the ALJ to determine whether the individual is currently engaging in substantial gainful activity ("SGA"). *See* 20 C.F.R. §§ 404.1520(b) and 416.920(b). SGA is defined as work activity that is both substantial and gainful; it involves doing significant physical or mental activities, usually for pay or profit. *See* 20 C.F.R. §§ 404.1572(a)-(b) and 416.972(a)-(b). If the individual is currently engaging in SGA, then a finding of not disabled is made. If the individual is not engaging in SGA, then the analysis proceeds to the second step.

The second step addresses whether the individual has a medically-determinable impairment that is severe or a combination of impairments that significantly limits him or her from performing basic work activities. *See* 20 C.F.R. §§ 404.1520(c) and 416.920(c). An impairment or combination of impairments is not severe when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on the individual's ability to work. *See* 20 C.F.R. §§ 404.1521 and 416.921; Social Security Rulings ("SSRs") 85-28, 96-3p, and 96-4p.[3] If the individual does not have a severe medically-determinable impairment or combination of impairments, then a finding of not disabled is made. If the individual has a severe medically-determinable impairment or combination of impairments, then the analysis proceeds to the third step.

Step three requires the ALJ to determine whether the individual's impairments or combination of impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appedix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926. If the individual's impairment or combination of impairments meet or equal the criteria of a listing and meet the duration requirement (20 C.F.R. §§ 404.1509 and 416.909), then a finding of disabled is made. *See* 20 C.F.R. §§ 404.1520(h) and 416.920(h). If the individual's impairment or

/ / /

----

[3] SSRs are the SSA's official interpretations of the Act and its regulations. *See Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1224 (9th Cir. 2009); *see also* 20 C.F.R. § 402.35(b)(1). They are entitled to some deference as long as they are consistent with the Act and regulations. *See Bray,* 554 F.3d at 1223 (finding ALJ erred in disregarding SSR 82-41).

combination of impairments does not meet or equal the criteria of a listing or meet the duration requirement, then the analysis proceeds to the next step.

Before considering step four of the sequential evaluation process, the ALJ must first determine the individual's residual functional capacity ("RFC"). *See* 20 C.F.R. §§ 404.1520(e) and 416.920(e). RFC is a function-by-function assessment of the individual's ability to do physical and mental work-related activities on a sustained basis despite limitations from impairments. *See* SSR 96-8p. In making this finding, the ALJ must consider all the relevant evidence such as symptoms and the extent to which they can reasonably be accepted as consistent with the objective medical evidence and other evidence. *See* 20 C.F.R. §§ 404.1529 and 416.929; SSRs 96-4p and 96-7p. To the extent that statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the ALJ must make a finding on the credibility of the individual's statements based on a consideration of the entire case record. The ALJ must also consider opinion evidence in accordance with the requirements of 20 C.F.R. §§ 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

The fourth step requires the ALJ to determine whether the individual has the RFC to perform his past relevant work ("PRW"). *See* 20 C.F.R. §§ 404.1520(f) and 416.920(f). PRW means work performed either as the individual actually performed it or as it is generally performed in the national economy within the last fifteen years or fifteen years prior to the date that disability must be established. In addition, the work must have lasted long enough for the individual to learn the job and to perform it as SGA. *See* 20 C.F.R. §§ 404.1560(b), 404.1565, 416.960(b), and 416.965. If the individual has the RFC to perform his past work, then a finding of not disabled is made. If the individual is unable to perform any PRW or does not have any PRW, then the analysis proceeds to the fifth and final step.

Step five requires the ALJ to determine whether the individual is able to do any other work considering his residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g) and 416.920(g). If he or she can do other work, then a finding of not disabled is made. Although the individual generally continues to have the burden of proving disability at this step, a limited burden of going forward with the evidence shifts to the Commissioner. The Commissioner is

/ / /

1  responsible for providing evidence that demonstrates that other work exists in significant numbers in

2  the national economy that the individual can do.  *Yuckert*, 482 U.S. at 141-42.

3  **III.   Factual Background.**

4         **A.   Testimony at Administrative Hearing.**

5       The Plaintiff appeared and was represented by counsel at the administrative hearing.  She

6  testified that she is not married, has one child, and was not working.  AR 33.  She was receiving income

7  from a worker's compensation recovery since receiving neck surgery.  AR 34.  The neck surgery helped

8  and she is better than before the surgery, but she still had stiffness and tightness of the neck.  *Id*.  She

9  spends most of her day in a big recliner chair since diagnosed with rheumatoid arthritis approximately

10  six months earlier.  AR 35.  She experienced sleeping spells and tired spells from rheumatoid arthritis

11  which caused her to sleep a lot.  *Id*.  She testified she did as little as she could because of her lower back

12  pain, and because she could not stand for very long.  *Id*.

13       She did not walk very far, and did not cook a lot except for microwaving.  AR 36.  She did not

14  do dishes on a daily basis because her neck got stiff with standing and her hand sometimes got stiff with

15  rheumatoid arthritis, which "popped up a few months ago."  AR 36.  She could not vacuum.  *Id*.  She

16  dusted by sitting down on the floor because her lower back hurt on standing or bending.  AR 37.  She

17  swept the floor with a hand-held duster.  AR 37.

18       The rheumatoid arthritis has affected her shoulders, back, hands and fingers which get stiff and

19  tight and are painful.  She was also getting bad headaches.  AR 38.  Her condition made it difficult for

20  her to have a relationship which affected everything, including "sexual and stuff".  *Id*.

21       The Plaintiff was able to walk a block, but after about a half an hour or so, her back started

22  hurting.  AR 39.  She was able to sit all day and testified that she basically sat or laid down.  AR 39.

23  She was able to stand twenty to thirty minutes at a time before getting low back pain which throbbed

24  down the back of both legs.  AR 40.  She did not lift over five to ten pounds.  *Id*.

25       She landed on both hands and knees on the fall at work.  AR 40-41.  Prior to the fall she had

26  problems with her low back.  AR 41.  The fall pushed her neck forward "kind of like whiplash," and

27  aggravated her lower back which got worse.  *Id*.  It was hard for her to drive because she had to watch

28  her mirrors and did not like to drive too much.  *Id.*  She lived thirty-five miles out of Las Vegas.  Her

daughter accompanied her when she drove to Las Vegas for groceries.  *Id*.  Her daughter also helped her to carry heavy things like cases of water.  AR 42.

The Plaintiff testified she had no hobbies or activities because she got tired a lot and just slept and watched TV.  AR 42.  She took as many as two naps a day from an hour to three hours at a time.  AR 42.  She attributed her sleep spells to a combination of medication side effects and chronic pain and indicated that they began after she was diagnosed with rheumatoid arthritis. Id.42-43.  The medication taken for pain helped a little by taking "off a little edge".  However, the pain never went away.  AR 43.  The doctor recommended lower back surgery and at the time of the hearing, she was awaiting authorization from the worker's compensation carrier for the surgery.  *Id*.

The Plaintiff testified she last worked in 2009 at a credit card company answering phones and working on the computer.  Her back got stiff and sore, and pain would go into her head.  *Id*.  AR 43-44.  She put heating pads and rubs to make the pain go away.  Id.44.  She was terminated from her job for missing time at work because of her neck and because she was not feeling good all the time.  AR 44.  She only made $5,000.00 the last year she worked because she left work so often.  *Id*.  She could not work as fast.  The combination of both reasons is why she was terminated.  *Id*.

She testified she did not believe she would be able to manage a less strenuous job with her symptoms.  Her fear was "more than overall the chronic pain is . . . the fatigue," the tired spells that she had.  AR 45.

Steroid injections prior to her surgery did not help.  AR 45.  The physical therapy made her pain worse and aggravated her legs which would throb.  *Id*.  Her lower back and neck would get worse with physical therapy.  AR 46.

Her pain affected her ability to sleep through the night.  AR 46.  She slept on and off for four hours, and then might wake up for two or three hours and then go back to sleep for an hour.  *Id*.  Medication made her a little drowsy sometimes.  *Id*.

She was unable to turn her neck all the way to her shoulders any longer.  AR 47.  She was able to look up higher than able to look down.  *Id*.

Vocational expert Kourtney Layton requested clarification before offering an opinion.  Specifically, Ms. Layton noted that the adult disability report indicated that the Plaintiff worked from

1986 to 2009 doing clerical work.  AR 47.  She requested more detail on what that work entailed.  AR

48.  The Plaintiff testified that in her work with the credit card company, she answered phone calls

which were not supposed to last longer than two minutes.  AR 48.  The company wanted employees to

be fast and that she was slowing down.  *Id*.  The work involved typing on the computer, answering

phones, and doing desk work.  *Id*.  She was at that job two-and-a-half years and at her prior

employment where she fell down for fourteen years.  *Id*.  Her prior employment involved working for a

casino as a PBX hotel operator answering phones.  *Id*.  At her prior employment, she had the same

problems with not being able to stand.  The property was torn down which is why she left.  AR 49.  She

was offered another job at another property, but it involved a job standing at the front desk which she

could not do because of her lower back.  AR 49.  This is why she left and got the job with the credit

card company.  *Id.*

Ms. Layton testified that a person of the Plaintiff's age, education, past work at the light level,

with limitations and only occasional climbing ropes, ladders or scaffold, occasionally kneeling,

crouching and crawling, with no concentrated exposure to hazards would be able to perform her past

work as a customer service representative and telephone operator.  AR 49-50.

**B.     Plaintiff's Medical Records.**

The Plaintiff has a significant history of neck and lower back problems predating her August,

2005, fall at work.  Diagnostic studies conducted after her August 17, 2005, accident established

degenerative changes of the cervical spine and thoracic spine.  AR 247.  MRI studies suggested

aggravation of her pre-existing low back complaints and worsening subjective low back pain, bilateral

lower extremity, radicular symptoms, neck pain, and upper extremity symptomatology.  *Id*.  The

recommendation was made to treat her with physical therapy and anti-inflammatories on October 9,

2005.  *Id*.  The suggestion was also made to get her off narcotics at that time.  *Id*.  She was released to

return to work on modified duty with a prescription for Voltaren and Flexeril October 25, 2005.  *Id.*

She was referred to physical therapy.  AR 248.

**1.     Dr. Mark Witt - Permanent Partial Disability Report.**

Plaintiff's prior medical history is summarized in the medical chronology contained in a

permanent partial disability report prepared by Mark Witt, D.O., in early 2007.  AR 244-264.  Dr.

Witt's report contains an extensive chronology dating back to 2002, which documented a history of low back pain following the birth of Plaintiff's child.  Dr. Witt exhaustively reviewed the medical records, and conducted a physical examination concluding that Plaintiff should receive a permanent partial disability award based on a nineteen percent whole person impairment.  AR 264.  The employer appealed and the hearings officer determined a second PPD rating evaluation was required.  AR 266-280.  A subsequent PPD evaluation was conducted by Dr. Perry.  His report is not in the administrative record.  However, a letter from the employer's worker's compensation claims coordinator dated August 19, 2008, indicates that the second PPD rating awarded Plaintiff the same nineteen percent whole body impairment earlier found by Dr. Witt.  AR 225.  The letter from the employer indicated the award entitled the Plaintiff to annual payments until July 31, 2031, or that she could elect a lump sum payment.  *Id*.

### 2.    Medical Records from 2002.

Plaintiff treated with Dr. Michael Prater at the Kraft Center for Pain Control on June 27, 2002, and August 25, 2002.  Dr. Prater performed epidural corticosteroid injections at L5-S1 and a selective nerve root block at L5 on August 25, 2002.  A July 18, 2002, MRI indicated mild degenerative disc changes with minor disc bulge at L5-S2, and no significant disc herniation or spinal stenosis.

### 3.    Medical Records from 2005.

The Plaintiff was treated at Southwest Medical Associates and at Nevada Orthopedic Spine Center with Dr. Dennis Gordon between March 2005, and April 29, 2005, for complaints of low back pain.  A diagnostic study on March 30, 2005, established mild spondylosis at L4-L5 and L5-S1.

She was seen by Dr. John Sigler at Spinal Orthopedic Rehab Specialists who assessed disc protrusion at C5-C6, C6-C7, with possible cervical radicular pain, right upper extremity, thoracic strain, lumbar pre-existing pain, and cervicogenic headaches on October 26, 2005.  AR 249.  An MRI of the lumbar spine done November 2, 2005, revealed L2-3 degenerative disc disease, L4-L5 minimal annular bulging, but normal disc hydration, large central canal, largely patent intervertebral foramina; L5-S1 disc desiccation, posterior right central paracentral disc herniation producing thecal sac distortion, mild impingement, associated prominent annular rent.  AR 249-50.  Dr. Sigler referred her for a consult with Dr. Schifini.  *Id*. 250.  Dr. Schifini's November 22, 2005 records indicate he took a thorough history

and physical exam and opined that the Plaintiff had cervical and thoracic sprain/strain related to her injury on August 17, 2005. AR 250. He felt that the Plaintiff had pre-existing C5-C6 disc protrusion causing spinal stenosis and multiple level pre-existing cervical degenerative disc disease and at best, an exacerbation of her symptoms of neck, upper back and arm pain. *Id*. Plaintiff elected to proceed with bilateral C5-C6 transforaminal selective epidural steroid injections. *Id*.

Dr. Schifini performed the selective epidural steroid injections December 16, 2005. AR 251. Plaintiff was seen by Dr. Sigler December 20, 2005, for a follow up. Dr. Sigler continued the Plaintiff on Neurontin, Skelaxin, Lidocaine patch and Percocet, and indicated that he would confer with Dr. Schifini to see if there was anything further to offer. *Id*. Dr. Sigler ordered electrodiagnostic studies which returned normal with no evidence of peripheral neuropathy, cervical radiculopathy or brachioplexopathy. AR 251-52. The Plaintiff's cervical strain, lumbar strain, and thoracic strain had resolved. AR 252. "Review of surveillance of the year shows she was very functional." *Id*. Dr. Sigler therefore opined he had nothing further to offer her. *Id*.

### 4.     Medical Records: 2006-2007.

Richard Cestkowski, D.O. conducted an independent medical examination July 12, 2006. He reviewed MRI findings which provided evidence of posterior central to right, paracentral disc herniation at L5-S1, mild impingement, bilateral S1 nerve roots, evidence of right and left lower extremity radiculitis. He concluded that the Plaintiff had objective findings in the neck and lower back based on the MRI, and evidence of radicular symptoms in the right, upper extremity and bilateral lower extremities. He recommended electrodiagnostic testing and that the Plaintiff be evaluated by an orthopedic spine specialist. AR 252.

A cervical MRI was done November 29, 2006, which revealed degenerative joint disease at C5-C6, and C6-C7 with no cord compression. *Id*.

Plaintiff was also seen by Dr. Kabins of Las Vegas Neurosurgery Orthopedics Rehab November 29, 2006, whose impression was pre-existing degenerative changes at L5-S1, pre-existing low back complaints, pre-dating work-related accident, and pre-existing asymptomatic cervical spondylosis predating her work injury. AR 253.

/ / /

1    Plaintiff continued to treat with Dr. Kabins and Dr. Schifini and had follow up diagnostic

2    studies in January 2007.  AR 253-54.  Dr. Schifini performed a lumbar discogram at L4-L5, and L5-S1

3    on January 30, 2007.  AR 254.  At a February 14, 2007, visit with Dr. Kabins a notation was made that

4    Plaintiff failed injection therapy and physical therapy and was considered to have an annular tear and

5    discogenic abnormality at L5-S1.  She was given the option to either live with her symptoms and

6    proceed to case closure or undergo surgical reconstruction of L5-S1.  Plaintiff reported she had previous

7    selective nerve block that provided marked relief of her pain.  Dr. Kabins recommended that if she

8    could live with her symptoms she should, but discussed possible surgical intervention.  *Id.*  Dr. Kabins

9    advised the Plaintiff that surgery was not curative and would not render her pain free.  *Id.*  However, a

10   request was made of her insurance carrier to consider the possibility of surgical intervention at L5-S1.

11   *Id.*

12   On February 23, 2007, Dr. Schifini performed transforaminal selective steroid injections at L5-

13   L6.  AR 256.  On February 28, 2007, Dr. Kabins saw Plaintiff and opined that she had reached

14   maximum mental improvement, and she was released to duty with no restrictions.  AR 256.  At that

15   time, she was not considered a candidate for cervical or lumbar spine surgery.  *Id.*

16   **5.    Medical Records from Dr. Papageorge.**

17   Plaintiff treated with Dr. Evangelia Papageorge at Southwest Medical Associates between

18   February 5, 2008, and August 27, 2009.  Diagnostic Assessments included lumbago, cervicalagia,

19   probable depression, anxiety disorder, not otherwise specified and chronic pain syndrome.  AR 282-

20   355.  She was prescribed a number of medications including Ibuprofen, Diazepam, Hydrocodone-

21   Acetaminophen, Methodone, Citolopram, and Gabapentin.

22   Plaintiff also saw Dr. Papageorge between February 11, 2010, and April 20, 2010.  She was seen

23   in follow up visits for right upper arm pain, left foot pain, knee pain when bending, neck pain, and for

24   an annual gynecological exam.  In visits on April 19, 2010, and March 22, 2010, her diagnostic

25   assessments included chronic pain syndrome although Dr. Papageorge noted she was in no acute

26   distress on April 19, 2010, and in no distress on March 22, 2010.

27   / / /

28   / / /

### 6.     Dr. Sherman's Orthopedic Examination & Evaluation.

Dr. Jerrold Sherman performed an orthopedic examination and evaluation on February 3, 2010. AR 358-363.  Plaintiff presented with complaints of posterior and anterior neck pain with constant aching pain without radiation to the arms or hands, numbness over the lateral aspects of both of her arms.  AR 358.  She claimed her pain was worsened with pushing or pulling or lifting weights heavier than twenty pounds, and painful limited neck motion.  *Id*.  She had normal grip strength and sensation in both hands.  *Id*.  He conducted a physical examination which indicated that Plaintiff entered the examining room with a normal gait using no cane, brace or assistive device, and easily walked on her heels and toes.  AR 359.  She performed normal squatting maneuver complaining of back and bilateral hip pain.  *Id*.  She got on the examining room table easily complaining of back pain as she sat up from a lying position "easily brining her fingertips to the level of her mid tibias."  *Id*.  She complained of neck pain, back pain and hip pain during the entire evaluation.  *Id*.  Examination indicated one-hundred percent normal range of motion of the neck, one-hundred percent normal pain free range of motion of the neck, both shoulders, elbows, wrists and small joints of the hands and fingers with normal grip strength bilaterally, and nerve and circulation intact in both hands.  Examination of the spine in standing position indicated one-hundred percent normal range of motion with no muscle spasm, but complaints of pain with light touch about the lumbar spine.  X-rays indicated moderate osteoarthritic changes at C5-6 and C6-7 with moderate disc space narrowing and early anterior osteophyte formation. *Id*.  His impression was cervical spine with multiple level osteoarthritis with complaints of pain, but no neurologic deficit, complaints of low back pain without neurologic deficit, and complaints of bilateral hip pain without neurologic deficit.  *Id*.  He concluded that the Plaintiff was able to sit, stand and walk for six hours during the course of an eight-hour day without an assistive device; that she could frequently lift twenty-five pounds and occasionally lift fifty pounds; and that she had no restrictions regarding forward bending at the waist, squatting, kneeling, pushing, pulling, grasping, or fine manipulation activities with the hands.  *Id*.

### 7.     Dr. Dhaliwal's RFC Assessment.

A physical residual functional capacity assessment was conducted by Dr. Navdeep Dhaliwal on February 10, 2010.  AR 364-371.  Dr. Dhaliwal found that the Plaintiff could occasionally lift twenty

1  pounds, frequently lift ten pounds, stand or walk six hours in an eight-hour work day, and sit six hours

2  in an eight-hour work day with normal breaks.  AR 365.  He found that she could frequently climb

3  ramps or stairs, occasionally climb ladders, ropes and scaffolds.  AR 366.  She could frequently balance

4  and stoop, and occasionally kneel, crouch and crawl.  *Id*.  No manipulative, visual , communicative or

5  environmental limitations were established with the exception that Plaintiff should avoid concentrated

6  exposure to hazards such as machinery and heights.  AR 367-368.  He disagreed with Dr. Sherman's

7  assessment that Plaintiff was capable of medium work based on x-ray findings showing moderate

8  osteoarthritic changes at C5-6, and C6-7, with moderate disc space narrowing and early anterior

9  osteophyte formation.  AR 371.  He concluded the Plaintiff had chronic neck and low back pain, with

10  no evidence of radiculopathy, and had the residual functional capacity to perform light work.  *Id*.

11     Dr. April Henry conducted a medical records review and concurred with Dr. Dhaliwal's

12  February 10, 2010, RFC assessment without other analysis or comment.  AR 397.

13           **8.      Medical Records from Dr. Elkanich.**

14     Plaintiff treated with Dr. Elkanich at Bone & Joint Specialists between October 2010, and June

15  2011.  Plaintiff reported rheumatoid arthritis as a recent health problem, and presented complaining of

16  decreased range of motion and cervical pain with some spasms.  AR 402.  On November 12, 2010, Dr.

17  Elkanich had a long talk with Plaintiff about her treatment options concluding that the majority of her

18  symptoms emanated from C5-C7, but that she may have some symptoms at C4-5.  AR 402.  The

19  Plaintiff elected to proceed with a surgical procedure.  *Id*.  Dr. Elkanich performed a partial

20  vertebrectomy/corpectomy with decompression of the spinal canal, neural foramina, and nerve root at

21  C4-C7, and placed an intervertebral body cage with a biomechanical device at C4-C5, C5-C6, and C6-

22  C7 on November 22, 2010.  AR 403.

23     Plaintiff was seen two weeks post surgery on December 7, 2010, and reported she was doing a

24  lot better with her neck problems.  AR 402.  However, she had significant exacerbation of her

25  rheumatoid arthritis because she stopped her medications to receive the surgery.  AR 402.  On her

26  initial visit on October 15, 2010, Dr. Elkanich discussed Plaintiff's treatment options with her for pain

27  dating back to 2005, indicating she had two choices: to live with the pain; or consider surgical

28  reconstruction.  AR 406-407.  She elected cervical reconstruction.  AR 407.  Dr. Elkanich evaluated her

work restrictions and determined that she was indicated for very light duty, with a sedentary-type

position and no lifting greater than five pounds with limitations on bending and twisting her cervical

spine. *Id*. He anticipated she would be able to return to light duty desk job between four to eight weeks

post operatively, a full duty job in approximately three to five months post operatively, with maximum

medical improvement approximately five months post operatively regarding her cervical spine. Dr.

Elkanich ordered EMG studies and an EMG report dated November 15, 2010, conducted by Dr. Firooz

Mashood revealed evidence of moderate right and left C6 and C7 radiculopathy without ongoing

denervation potentials and mild left ulnar nerve neuropathy at wrist involving sensory fibers. AR 424.

There was no electrodiagnostic evidence of right and left median and right ulnar nerve entrapment

neuropathy.

On June 20, 2011, Dr. Elkanich requested authorization for micro decompression surgery on L5-

S1. AR 595.

### 9.     Medical Records from Dr. Alain Coppel.

Plaintiff was referred to Nevada Comprehensive Pain Center where she saw Dr. Alain Coppel.

On November 10, 2010, Dr. Coppel adjusted the Plaintiff's medications. Specifically, Plaintiff was

taking Methadone "PRN" (as needed). Dr. Coppel explained that that is not the way that Methadone

should be used, and that it should be taken every eight hours for pain relief. He also switched the

dosage of Neurontin to a lower dosage three times a day indicating the dose would be slowly increased

over time. Her Lortab prescription was diminished from four times per day to two times per day for

breakthrough pain. AR 586.

On April 12, 2011, Plaintiff reported to Dr. Coppel that the April 2011 bilateral nerve blocks

helped with her headaches in that she now had occasional headaches instead of daily headaches. AR

559. She assessed her neck pain as three on a scale of one to ten and stated it waxed and waned

between three and five on the one to ten scale. She assessed her low back pain as a seven on a scale of

one to ten, but indicated it waxed and waned between five and eight on a scale of one to ten. *Id*. Dr.

Coppel diagnosed her with cervical disc displacement; cervical spondylosis; cervical

radiculitis/radiculopathy; lumbar disc displacement; thoracic/lumbar radiculitis/radiculopathy;

lumbosacral spondylosis; and occipital neuralgia. *Id*. He noted that her pain was well controlled on her

current medications with minimal side effects and continued her on her existing prescriptions.  AR 562.
Her existing medications included Methadone, Percocet, and Neurontin three times per day.  AR 559.

On a return visit to Dr. Coppel on May 10, 2011, Plaintiff reported neck pain as four on a scale of one to ten, and low back pain as an eight on a scale of one to ten.  As recommended by her orthopedic specialist, a discography at L4-L5 and L5-S1, and if positive at L4-L5, a discography would also be performed at L3-L4.  Dr. Coppel again noted that the Plaintiff continued to obtain good pain relief with minimal side effects on her current medications and continued her prescriptions.  AR 567. Patient instructions included increasing her physical activity as tolerated.  *Id*.  In visits on January 12, 2011, February 9, 2011, and March 16, 2011, Plaintiff reported neck and back pain.  On each of these visits Dr. Coppel noted that Plaintiff was receiving good pain relief and her conditions were well controlled on current medications with minimal side effects, and that her medications would be continued.  AR 569-581.

**10.      Medical Records of Various Procedures.**

An MRI of the lumbar spine was done April 22, 2011, which revealed mild, multilevel degenerative disc disease and facet arthrosis resulting in no significant central canal or neural foraminal alterations.  An annular tear was noted at L5-S1 with focal disc protrusion superimposed on the annular disc bulge and no significant impact on the central canal or either neural foramina.  AR 466-67.

Plaintiff had a left and right occipital nerve block performed by Sahara Surgery on April 4, 2011.  AR 516-517.  Lumbar discograms at L4-5, and L5-S1 were performed May 16, 2011.  AR 518-19.

A CT of the lumbosacral spine performed May 16, 2011, showed discogenic disease and facet degenerative changes involving L4-L5 and L5-S1 suggestive of an annular tear.  AR 593-594.

**IV.      The ALJ's Decision.**

The ALJ followed the five-step sequential evaluation process set forth at 20 C.F.R. §§ 404.1520 and 416.920, and issued an unfavorable decision on June 30, 2011.

At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since July 23, 2009, the alleged onset date.

/ / /

1    At step two, the ALJ found that Plaintiff had the severe impairments of degenerative disc disease
2  of the cervical and lumbar spine.  He found that the medical evidence established that the Plaintiff had
3  limitations in her capacity to perform basic work activities due to her severe physical impairments.  He
4  noted there was discussion in the medical records of depression and anxiety.  However, the Plaintiff
5  declined anti-depressants, and described her anxiety as mild.  She reported medication prescribed for
6  anxiety improved her mood, and in October 2010, denied experiencing depression or nervousness.  He
7  therefore found that the Plaintiff's mental impairments were non-severe.

8    He also noted that the Plaintiff was diagnosed with rheumatoid arthritis in 2010 affecting her
9  hands, shoulders, feet, knees, and hips, and that laboratory testing proved positive for rheumatoid factor.
10  Plaintiff was treated with medication and experienced an exacerbation of symptoms after her cervical
11  spine surgery in 2010, because she was required to stop taking medication prior to surgery.  However, he
12  found there was insufficient medical documentation to support functional difficulties based on her
13  rheumatoid arthritis, meaning the twelve-month durational requirement of the Social Security Act.

14    The ALJ also found that the Plaintiff did not have an impairment or combination of impairments
15  that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart B, Appendix
16  1.

17    At step three, the ALJ concluded that Plaintiff had the residual functional capacity to perform
18  light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with limitations of occasional
19  climbing of ladders/ropes/scaffolds, kneeling, crouching and crawling; frequent climbing of stairs/ramps,
20  balancing and stooping; and that she must avoid concentrated exposure to hazards, and was limited to
21  occasional overhead reaching.  In making the RFC assessment, the ALJ considered all symptoms and the
22  extent to which these symptoms could reasonably be accepted as consistent with the objective medical
23  evidence and other evidence based on the requirements of 20 C.F. R. § 404.1529 and 416.929, and SSRs
24  96-4p and 96-7p.  He also considered opinion evidence in accordance with 20 C.F.R. § 404.1527 and
25  416.927 and SSRs 96-2p, 96-5p, 96-6p, and 06-3p.

26    The ALJ indicated he followed the two-step process and first determined whether there was an
27  underlying medically determinable physical or mental impairment shown by medically acceptable
28  clinical and laboratory diagnostic techniques that could reasonably be expected to produce the Plaintiff's

16

1   pain or other symptoms.  He found that the Plaintiff's medically determinable impairments could

2   reasonably be expected to cause the alleged symptoms.  At step two, he evaluated whether the intensity,

3   persistence, and limiting effects of the Plaintiff's symptoms and whether they were substantiated by

4   objective medical evidence.  The Plaintiff reported constant neck pain, exacerbated by sitting, typing,

5   and driving.  She also reported her pain was aggravated by standing, lifting, walking, and weather

6   changes.  She reported intermittent radiation of her neck pain down the right upper extremity laterally to

7   the elbow, difficulty grabbing objects and lifting her arms, and continuous tingling and throbbing of the

8   bilateral lower extremities extending to the knees.

9          The ALJ found that the Plaintiff's statements concerning the intensity, persistence and limiting

10  effects of the symptoms not credible to the extent they were inconsistent with his RFC assessment.  He

11  reviewed and summarized the medical record on which his findings were based.  He also considered the

12  opinion evidence.  Specifically, an opinion in the file indicating Plaintiff had a limitation of lifting five

13  pounds and limited bending and twisting of the cervical spine offered in October 2010.  He did not give

14  this opinion any weight because it was not intended to be a final opinion on her functional capacity since

15  she was undergoing surgery and anticipated to return full-time job duties after the operation.  He also

16  considered the disability evaluation of Mark Witt, D.O. in April 2007, in connection with the Plaintiff's

17  worker's compensation claim.  Dr. Witt opined that the Plaintiff had a whole person impairment of

18  nineteen percent, but did not identify any specific work-related functional limitations, and therefore, the

19  ALJ gave his opinion no weight.  The record contained a reference to a nineteen percent whole person

20  impairment offered by Rod Perry, D.C., a chiropractor.  However, his report was not in the record.  The

21  ALJ acknowledged that Plaintiff was awarded a permanent partial disability of nineteen percent for her

22  worker's compensation injury.  However, the ALJ was not bound by this determination because the

23  Nevada worker's compensation system uses different legal standards to assess disability and the finding

24  that the disability was partial does not equate to a complete inability to sustain full-time work.

25         The ALJ gave some weight to the physical consultative examination with Jerrold Sherman, M.D.,

26  in February 2010.  Dr. Sherman found that Plaintiff entered the examining room with normal gait and

27  easily walked on her heels and toes and performed a normal squatting maneuver.  The Plaintiff was able

28  to easily get on and off of the examining table, but complained of back pain as she sat up from a lying

1  position. Deep tendon reflexes and sensation were within normal limits in the bilateral lower extremities

2  and straight-leg raise test was negative. Dr. Sherman opined that the Plaintiff was capable of performing

3  the full range of medium work. The ALJ gave his opinion some weight, but not "full weight" because

4  the Plaintiff had a subsequent neck surgery and diagnostic testing of the lumbar spine post evaluation

5  which showed degenerative changes and radiculopathy.

6         The ALJ also considered the state agency physical consultative assessment which found the

7  Plaintiff was capable of performing light work, with the ability to occasionally climb

8  stairs/ropes/scaffolds, kneel, crouch and crawl, frequently climb ramps/stairs, balance and stoop, but

9  avoid concentrated exposure to hazards. He found this assessment was most probative because it was

10 well supported by the objective medical evidence and consistent with the record as a whole. However,

11 the ALJ found that the Plaintiff was also limited to occasional overhead reaching because of symptoms

12 associated with her cervical spine. The ALJ concluded that his RFC assessment was supported by the

13 substantial weight of objective medical evidence, the Plaintiff's improvement post-cervical spine

14 surgery, her level of daily activity, her acknowledgment that pain medications help control her

15 symptoms, and the opinion of the state agency physical consultative assessment which he gave

16 significant weight.

17        The ALJ found Plaintiff was capable of performing her past relevant work as a customer service

18 representative and telephone operator. He compared the Plaintiff's RFC with the physical and mental

19 demands of the work and found the Plaintiff was capable of performing it as actually and generally

20 performed. He relied on the testimony of vocational expert Kourtney Layton, who testified that the

21 Plaintiff's past relevant work as a customer service representative was classified as skilled/light exertion,

22 and telephone operator was classified as semi-skilled/sedentary exertion. At the hearing, the ALJ posed

23 a hypothetical question which supported his conclusion that the Plaintiff would be able to perform the

24 claimant's past relevant work as a customer service representative and telephone operator as genuinely

25 and actually performed. Thus, although the ALJ concluded that Plaintiff's impairments were severe, he

26 found they did not restrict her to such a degree that she was precluded from performing her past relevant

27 work. He therefore found that the Plaintiff had not been under a disability as defined by the Social

28 / / /

Security Act from July 23, 2009, through the date of his decision, and she was not entitled to the benefits.

**V.    The Parties' Positions.**

    **A.    Plaintiff's Motion for Reversal.**

The Plaintiff argues that the ALJ improperly determined that she was capable of performing her past relevant work.  Specifically, Plaintiff argues that the ALJ rejected or overlooked nearly all of her most serious impairments which include Chronic Pain Syndrome ("CPS"), which has been diagnosed and treated by many doctors for years preceding the industrial accident that precipitated filing this claim. The record is replete with references to CPS.  However, the state's consulting doctor failed to diagnose it or account for its effects, or the effects of medications used to treat it.  Plaintiff claims that the ALJ ignored a "mountain of evidence" and improperly rejected her testimony based on misleading and inaccurate facts.  Plaintiff claims that she suffers from a series of medical conditions that disable her: CPS; cervical disc displacement; cervical spondylosis; cervical radiculitis/radiculopathy; lumbar disk displacement; thoracic and lumbar radiculitis/radiculopathy; lumbo-sacral spondylosis; occipital neuralgia; rheumatoid and osteoarthritis; and the emotional disorders of depression and anxiety.

Plaintiff maintains that the ALJ did not fairly evaluate the evidence in the record and erred in finding her only severe impairments were degenerative disc disease of the cervical and lumbar spine.  He found Plaintiff's CPS, depression, rheumatoid arthritis, and headaches non-severe because they were not confirmed by objective evidence or did not last twelve months in a row.  However, Plaintiff argues the ALJ's reasoning is not compatible with the definition of disability under the Social Security Act which defines a disability as the inability to do any substantial gainful activity by reason of a medically determinable physical or mental impairment that can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.  The ALJ found that her rheumatoid arthritis was non-severe because it did not meet the twelve-month durational requirement of the Act, but committed reversible error by not considering whether it could reasonably be expected to last for a continuous period of not less than twelve months.  He did not properly consider SSR 82-55 or 82-56 in making findings concerning the durational requirement, and made no finding that the Plaintiff
/ / /

1   would recover prior to the end of the twelve-month durational requirement, or that she had been

2   responding well to treatment.

3        Plaintiff also claims that he did not appropriately apply SSR 83-2 in determining the onset date

4   of Plaintiff's rheumatoid arthritis which is a progressive impairment for which an onset date must be

5   inferred from the medical and other evidence that describe the history and symptoms of the disease.

6        The ALJ's decision does not even mention Plaintiff's CPS, or medication taken to address it.

7   Plaintiff's medications included anti-depressants, Hydrocodone, Lododerm patches, and later,

8   Methadone.  The ALJ also did not consider the significant and dangerous side effects of prescribed

9   medication such as Methotrexate, Gabapentin, and Methadone.  The ALJ did not address the treatment

10  Plaintiff has received for CPS by numerous providers, including pain management specialists, or address

11  the multiple treatment modalities she has received over the years.  Plaintiff contends the ALJ improperly

12  rejected the opinions of Plaintiff's treating physicians in favor of the profoundly different opinions of

13  state agency doctors Jerrold Sherman and April Henry.  These doctors restricted their opinions to

14  limitations caused by degenerative disc disease.  Plaintiff's treating physicians' records reflect Plaintiff's

15  constant pain and heavy medications for pain.  The opinion of an examining physician is entitled to

16  greater weight than the opinion of a non-examining physician, and the ALJ's conclusions about the

17  weight given to each are not supported by substantial evidence.

18       The Ninth Circuit has specifically held that CPS is a disabling condition which links physical and

19  mental impairments.  Social Security Ruling 03-2p addresses the evaluation of Reflex Sympathetic

20  Dystrophy Syndrome ("RSDS"), also known as Complex Regional Pain Syndrome ("CRPS").  Plaintiff

21  claims that RSDS is a type of CPS arising most often from trauma to an extremity with complaints of

22  intense pain and initial findings of autonomic dysfunction.

23       Plaintiff also argues the ALJ erred in determining Plaintiff had the RFC to perform nearly a full

24  range of light work and did not consider non-exertional limitations of pain and the side effects of her

25  potent medication.  Therefore, the hypothetical he posed to the vocational expert was flawed and cannot

26  support his findings.  The medical record documents Plaintiff's allegations of persistent disabling pain,

27  and the ALJ did not have clear and convincing reasons for rejecting her testimony about the extent of her

28  pain.  The ALJ may not discredit a Plaintiff's testimony and the severity of symptoms merely because

1   they are unsupported by objective medical evidence, unless there is evidence of malingering.  Instead,

2   the ALJ may properly reject a claimant's testimony about the severity of symptoms only by offering

3   "specific, clear and convincing reasons for doing so."  In this case, the ALJ did not even acknowledge

4   Plaintiff's non-exertional limitations.

5          For all of these reasons, the court should exercise its discretion to reverse and remand the matter

6   for an award of benefits rather than for rehearing.  Reversal for payment of benefits is appropriate in this

7   case because the record is fully developed and supports a finding of disability.

8          **B.      The Commissioner's Cross Motion to Affirm**.

9          The Commissioner argues that the ALJ's decision was supported by substantial evidence and

10  should be affirmed.  The opposition argues that the Plaintiff has not appropriately summarized portions

11  of the medical and testimonial evidence.  In this case, the Plaintiff's primary argument is the ALJ erred

12  by not including CPS as one of Plaintiff's severe impairments at step two of the sequential analysis.

13  However, the Commissioner maintains that not all of the doctors who have evaluated Plaintiff have

14  agreed that she has CPS.  At least eleven physicians diagnosed Plaintiff with conditions other than CPS,

15  including Plaintiff's two most recent treating physicians, Alain Coppel, M.D., and G. Michael Elkanich.

16  Dr. Elkanich commented in a progress note dated November 12, 2010, that he believed the majority of

17  the Plaintiff's symptoms related to C5-7 and assessed her with cervical disc protrusion, degeneration,

18  neck pain, radiculopathy and mild spondylolisthesis.  Another of Plaintiff's treating physicians, Dr.

19  Cestkowski noted, "no evidence of right or left upper extremity chronic regional pain syndrome".  Drs.

20  Perry, Witt, Siegler, Shifinni and Braunstein did not diagnose her with CPS, nor did the two state agency

21  doctors and consultative examiner.

22         The Commissioner claims there is ample support for the ALJ's conclusion that Plaintiff had

23  degenerative disc issues related to her neck and back.  The clinical findings and medical opinions in the

24  record made it reasonable for the ALJ to include degenerative disc disease as a severe impairment as

25  opposed to CPS.  Where, as here, the evidence is susceptible to more than one rational interpretation, the

26  ALJ's conclusion must be upheld because it is the ALJ's duty to resolve conflicts in the evidence.

27         Even if Plaintiff has CPS as she claims, a diagnosis of CPS is not sufficient to sustain a finding

28  of disability.  The Commissioner disputes that the Ninth Circuit made any finding that CPS is a disabling

condition.  The Commissioner maintains that it is the opinions on the functional limitation rather than the underlying diagnosis that is relevant to a determination of whether a Plaintiff is disabled.

Plaintiff's brief focuses on the numerous symptoms CPS can cause, but does not establish that Plaintiff actually experienced them.  Similarly, her brief refers to the significant and dangerous effects that her prescribed medications could cause her, but does not claim she actually experienced these side effects.  Her treating physician, Dr. Coppel, made repeated notations in his records between December 16, 2010, and May 10, 2011, just prior to the hearing, that Plaintiff continued to obtain good pain relief with minimal side effects on current medications.

The Commissioner also argues that the fact that the Plaintiff suffers from rheumatoid arthritis, a medically determinable condition, does not automatically mean the symptoms are severe or disabling as defined by the Social Security Regulations.  Many medical conditions produce pain not severe enough to preclude gainful employment, and mere diagnosis of an impairment is not sufficient to sustain a finding of disability.  The Commissioner points to portions of the medical evidence which establish Plaintiff reported improvement with medication, although she had a flare up when she had to discontinue medication because of her neck surgery.  Medication was restarted in February 2011, and there are no subsequent complaints of rheumatoid arthritis after February 2011.  Substantial evidence in the record supports the ALJ's conclusion that Plaintiff's rheumatoid arthritis was not a severe impairment.

The Commissioner also maintains that Plaintiff's brief cites several pages in the transcript that do not support her claim they show complaints or treatment for headaches.  However, the ALJ acknowledged Plaintiff was treated for headaches in April 2011, with bilateral occipital nerve blocks, but also noted that by May 2011, Plaintiff had progressively improved.  Doctor Coppel's notes also show that after the nerve blocks, Plaintiff's headaches were occasional rather than daily.

The ALJ also considered Plaintiff's reports of depression and mild anxiety, but noted that she initially declined anti-depressants and that she was eventually placed on medication which improved her mood.  Impairments that can be controlled effectively with medication are not disabling for purposes of determining eligibility for SSI benefits.  Moreover, Plaintiff denied experiencing depression or nervousness in October 2010, and in followup visits in January through May 2011.  Thus, the ALJ

/ / /

1  reasonably determined that Plaintiff's complaints of headaches and depression were not severe

2  impairments.

3        The Commissioner contends that the ALJ properly resolved conflicts in the medical opinion

4  evidence.  RFC is not a medical finding, but an administrative one left to the Commissioner's discretion,

5  and must be based on analysis of the record as a whole.  When there is conflicting medical evidence, the

6  ALJ must provide specific and legitimate reasons, supported by substantial evidence, for rejecting the

7  opinion of medical experts.  The ALJ can meet this burden by thoroughly summarizing the facts and

8  conflicting clinical evidence stating his interpretation in making appropriate findings.  The ALJ did so

9  and provided valid reasons for recording the medical opinions the way that he did.

10        The Commissioner disputes that the opinions of Plaintiff's treating physicians were profoundly

11  different from those of the consultative examiner and state agency doctors.  The Commissioner points

12  out that even Dr. Elkanich expected the Plaintiff to return to full duty after her surgery.  In this case, the

13  ALJ based his RFC finding on the opinions of the state agency physicians whose opinions were

14  consistent with the evidence as a whole, and the consultative examiner who agreed Plaintiff was capable

15  of working, as well as Plaintiff's treating physicians' determination that her condition had improved and

16  that she had good pain relief with medication.

17        The Commissioner asserts that the ALJ properly relied on the vocational expert's testimony and

18  disputes that the ALJ's hypothetical to the expert was incomplete.  It was reasonable for the ALJ to

19  conclude, from his consideration of the record as a whole, that Plaintiff's pain was under control and any

20  side effects from her medications were not debilitating.  The ALJ's hypothetical to the vocational expert

21  contained the limitations the ALJ found credible and supported by substantial evidence and his reliance

22  on the response was therefore proper.

23        The ALJ also properly found Plaintiff's subjective symptom testimony was not fully credible.

24  He found that Plaintiff's degenerative disc disease was a severe impairment, but that her statements

25  concerning the extent of her symptoms and limitations were not fully credible.  He based this finding on

26  support in the record that her condition had progressively improved and that she was experiencing good

27  pain relief with medication.  No doctor found her as severely limited as she claimed, and in fact, Dr.

28  Elkanich opined shortly before her surgery that she was "indicated for a very light-duty, sedentary job

1   position, no lifting greater than five pounds, limited bending, twisting of her cervical spine," but

2   anticipated she would return "to a light duty desk job between four to eight weeks post operatively and a

3   full duty job in approximately three to five months." Thus, the ALJ's credibility findings were

4   supported and sufficiently specific to insure this court that he did not arbitrarily discredit the Plaintiff's

5   objective testimony.

6        For all of these reasons, the court should affirm the Commissioner's final decision because the

7   ALJ's findings are supported by substantial evidence and free from reversible error. However, if the

8   court disagrees, it should remand the case to the agency so that the Commissioner may correct any

9   perceived error. The Commissioner disagrees, for the record, with the Ninth Circuit's "propensity" to

10   credit as "true" evidence it finds the agency improperly assessed. The Ninth Circuit has held that the

11   court may make a disability finding only if: (1) an ALJ failed to provide legally sufficient reasons for

12   rejecting challenged evidence; (2) there are no outstanding issues that must be resolved before a

13   determination of disability can be made; and (3) it is clear from the record that the ALJ would be

14   required to find the claimant disabled where the evidence in question is credited. *See Benecke v.*

15   *Barhnart*, 379 F.3d 587, 893 (9th Cir. 2004). However, other decisions in the Ninth Circuit recognize an

16   intra-circuit conflict concerning whether the credit as true doctrine is mandatory in the Ninth Circuit.

17        **C.      Plaintiff's Reply.**

18        Plaintiff's reply reiterates arguments that the ALJ did not address or consider Plaintiff's disabling

19   conditions which include CPS, headaches, depression and RA which preclude her from working on a

20   sustained basis. Plaintiff's primary treating physician, Dr. Papageorge diagnosed the Plaintiff with CPS.

21   Plaintiff also contends the ALJ committed reversible error by failing to give clear and convincing

22   reasons for rejecting Plaintiff's testimony in favor of the objective medical record. The government's

23   opposition brief cites medical records years before Stephens claimed she was disabled. The ALJ also

24   committed reversible error by not considering RA as a severe impairment because it had not lasted for

25   twelve continuous months since first diagnosed. The government supports this conclusion by referring

26   to Dr. Coppel's records indicating they contain no subsequent complaints of RA after February 2011.

27   Dr. Coppel was a worker's compensation doctor who treated the Plaintiff for pain related to her

28   / / /

1    industrial accident, not RA.  Thus, Plaintiff contends he would have no reason to record complaints of

2    RA because he did not see her after her worker's compensation case was closed.

3    **V.    Analysis and Findings**

4          Reviewing the record as a whole, weighing both the evidence that supports and the evidence that

5    detracts from the ALJ's conclusion, the court finds the ALJ's decision is supported by substantial

6    evidence, and the ALJ did not commit reversible error.

7          Reviewing the record as a whole and reasonable inferences drawn from the medical record

8    supports the ALJ's conclusion that the Plaintiff is capable performing her past relevant work as a

9    customer service representative and telephone operator.  None of the Plaintiff's treating physicians have

10   opined that Plaintiff is incapable of performing her past relevant work or that she has physical or non-

11   exertional limitations which prevent her from working.  Plaintiff claims the ALJ erred in failing to

12   consider that she suffers from a series of medical conditions that disable her, specifically chronic pain

13   syndrome, cervical disc displacement, cervical spondylosis, cervical radiculitis, radiculopathy, lumbar

14   disc displacement, thoracic and lumbar radiculitis, radiculopathy, lumbro-sacral spondylosis, occipital

15   neuralgia, rheumatoid and osteoarthritis, and the emotional disorders of depression and anxiety.

16         Plaintiff applied for disability benefits alleging she was disabled and unable to work due to neck

17   and low back pain, and requested reconsideration of denial based on her neck and low back pain.  AR

18   69.  At the conclusion of the administrative hearing, counsel for Plaintiff emphasized that Plaintiff's

19   chronic pain and range-of-motion limitations of the cervical spine should rule out a return to her past

20   work and to full-range of sedentary work.  AR 50.  Plaintiff was not diagnosed with rheumatoid arthritis

21   until late-2010.

22         Plaintiff's primary treating physician, Dr. Papageorge, at Southwest Medical Associates,

23   diagnosed Plaintiff with a variety of conditions, including chronic pain syndrome.  However, Dr.

24   Papageorge's records do not indicate she opined that any of the Plaintiff's conditions, or combination of

25   conditions, precluded her from working.  The records reflect that Plaintiff has had complaints of chronic

26   pain dating back to the birth of her daughter in 1996.  However, Plaintiff's chronic pain did not prevent

27   her from working.  Dr. Kabins released Plaintiff to return to work on February 23, 2007, with no

28   restrictions after her August 2005 work-related injury.  Plaintiff returned to work as a casino PBX

1   operator and only stopped working at that position because the casino was torn down.  The Company

2   offered the Plaintiff a position with another property, suggesting the employer was satisfied with

3   Stephens' job performance, but Plaintiff declined it because it was a front desk job that involved

4   standing.  Plaintiff then went to work for a credit card company for another two-and-a-half years.

5   Plaintiff testified she was terminated from her job at the credit card company for missing too much time

6   at work because she did not feel well.

7       At the administrative hearing in this matter, Plaintiff testified that she believed she could no

8   longer work primarily because of fatigue rather than her overall chronic pain.  She attributed her fatigue

9   or tired spells to a combination of the effects of her medications and her overall chronic pain which had

10  worsened since she had been diagnosed with rheumatoid arthritis.

11      At the February 3, 2010 examination and evaluation conducted by Dr. Jerrold Sherman, Plaintiff

12  complained of neck and back pain.  However, on examination Dr Sherman indicated that Plaintiff had

13  normal grip strength in both hands, one-hundred percent range-of motion of her neck, both shoulders,

14  elbows, wrists, and small joints of the hands and fingers.  She also had one-hundred percent range-of-

15  motion of the spine in the standing position.  X-rays indicated moderate osteoarthritic changes at C5-6,

16  and C6-7 with moderate disc space narrowing and early anterior osteophyte formation.  He concluded

17  Plaintiff had multi-level osteoarthritis of the cervical spine without neurologic deficit of the cervical

18  spine, lower back or hip.  He concluded that the Plaintiff was capable of performing moderate level

19  work.

20      The ALJ relied on Dr. Sherman's orthopedic examination and evaluation, but found Plaintiff was

21  capable of light rather than moderate work based on Dr. Dhaliwal's RFC assessment.  Dr. Dhaliwal

22  disagreed with Dr. Sherman's assessment that Plaintiff was capable of medium work based on x-ray

23  findings showing moderate osteoarthritic changes at C5-6, and C6-7 with moderate disc space narrowing

24  and early anterior osteophyte formation.  Dr. Dhaliwal concluded that Plaintiff had chronic neck and low

25  back pain, with no evidence of radiculopathy, and the RFC to perform light work.  The ALJ adopted Dr.

26  Dhaliwal's assessment.  A February 10, 2010 medical records review conducted by Dr. April Henry

27  concurred in Dr. Dhaliwal's RFC assessment without other analysis or comment.  Thus, there is ample

28  / / /

1   support in the record for the ALJ's finding that Plaintiff was capable of performing light work despite

2   her neck and low back impairments.

3          Plaintiff also indicates that the ALJ did not consider Plaintiff's emotional disorders of depression

4   and anxiety.  However, the ALJ considered these conditions, but concluded they were not severe

5   impairments based on medical records indicating Plaintiff declined anti depressant medication, and

6   reported that medication she was prescribed for anxiety improved her mood.  Thus, the ALJ's conclusion

7   that Plaintiff's mental impairments were non-severe has substantial support in the record.

8          Plaintiff's other surgeon, Dr. Elkanich, at Bone & Joint Specialists also opined that Plaintiff

9   would be able to return to light duty desk work four to eight weeks post operatively, and full duty three

10  to five months post operatively from her November 2010 surgery.  The ALJ did not give this opinion

11  much weight because it was made before Plaintiff's surgery, and not intended to be a final opinion.

12          Plaintiff argues that she is unable to work at her past relevant work because of chronic pain or

13  side effects associated with her medication.  The government correctly points out that, although

14  Plaintiff's brief argues the numerous symptoms chronic pain syndrome can cause, the record does not

15  establish that Plaintiff actually experienced these symptoms.  Additionally, although Plaintiff's brief

16  mentions significant and dangerous side effects that her prescribed medication could cause her, the

17  record does not support a finding that she actually experienced these side effects.  The court agrees.

18  Plaintiff treated with Dr. Coppel, a pain management specialist, between December 2010, and May 10,

19  2011, just prior to the hearing in this case.  Dr. Coppel's records contain repeated comments that Ms.

20  Stephens' pain was "well controlled on current medications" and that the Plaintiff "continues to obtain

21  good pain relief with minimal side effects on current medications."  Dr. Coppel repeated both of these

22  comments on Plaintiff's last visit on May 11, 2011, just prior to the June 21, 2011 administrative

23  hearing.

24          Finally, it is undisputed that Plaintiff was diagnosed with rheumatoid arthritis in late-2010.

25  However, Plaintiff cites no portion of the medical record which indicates Plaintiff's rheumatoid arthritis

26  is so severe that it prevents her from performing light, sedentary work.  The ALJ's finding that there was

27  insufficient support in the medical record that Plaintiff's RA was causing functional difficulties expected

28  to last at least twelve months is supported by the record.

## VI.   Conclusion

Judicial review of a decision to deny disability benefits is limited to determining whether the decision is based on substantial evidence reviewing the administrative record as a whole.  If the record will support more than one rational interpretation, the court must defer to the Commissioner's interpretation.  If the evidence can reasonably support either affirming or reversing the ALJ's decision, the court may not substitute its judgment for the ALJ's.  *Flaten*, 44 F.3d at 1457.  It is the ALJ's responsibility to make findings of fact, drawing reasonable inferences from the record as a whole, and to resolve conflicts in the evidence and differences of opinion.  Having reviewed the Administrative Record as a whole, and weighing the evidence that supports and detracts from the Commissioner's conclusion, the court finds that the ALJ's decision is supported by substantial evidence under 42 U.S.C. § 405(g).

For all of the foregoing reasons,

**IT IS RECOMMENDED**:

1.      Plaintiff's Motion to Remand (Dkt. #11) be **DENIED**.

2.      The Commissioner's Cross-Motion to Affirm (Dkt. #14) be **GRANTED**.

Dated this 27th day of February, 2014.

PEGGY A. LEEN
UNITED STATES MAGISTRATE JUDGE

28